# UNITED STATE DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND )
ETHICS IN WASHINGTON, )
)
     Plaintiff, )
)
     v. )     Civil Action No. 11-951 (CKK/JMF)
)
FEDERAL ELECTION COMMISSION, )
)
     Defendant. )

## REPORT AND RECOMMENDATION

This matter comes on referral from Judge Colleen Kollar-Kotelly to determine whether the motion for an award of attorney's fees filed by plaintiff Citizens for Responsibility and Ethics in Washington ("CREW"), Plaintiff's Motion for an Award of Attorneys' Fees and Costs [#24], should be granted. See Order [#31]. For the reasons stated below, this Court recommends that Judge Kollar-Kotelly grant the motion in full and award CREW $139,998.68 in attorney's fees and $500 in costs.[1]

## I.   Background

On March 7, 2011, CREW submitted a request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,[2] to the Federal Elections Commission ("FEC") via facsimile seeking: 1) correspondence between three named FEC commissioners and outside entities and

---

[1] In its memorandum attached to its motion, CREW asks for a total of $122,813.75 for three attorneys: Anne Weismann, Adam Rappaport, and Melanie Sloan. See Memorandum of Points and Authorities in Support of Plaintiff's Motion for an Award of Attorneys' Fees and Costs [#24-1] at 21. In its Reply in Support of Plaintiff's Motion for an Award of Attorneys' Fees and Costs [#30], CREW asks for additional amounts for each of its three lawyers: "XXX" for Wesimann, $1,347.50 for Rappaport, and $757.50 for Sloan. [#30] at 25 n.12. Clearly, the "XXX" was a placeholder that CREW neglected to replace with the actual amount, $15,079.93. See Supplemental Declaration of Anne L. Wesimann [#30-1] at 7. The Court cannot fathom why CREW did not total all of the money that it seeks, but the Court has determined that the amount is $139,998.68.
[2] All references to the United States Code are to the electronic versions that appear in Westlaw or Lexis.

parties; 2) calendars and agendas for the three commissioners; 3) all written ex parte communications delivered to an ethics official by the three commissioners or someone acting on their behalf; and 4) statements setting forth the substance and circumstance of any ex parte communication prepared by the three commissioners or someone acting on their behalf. Memorandum of Points and Authorities in Support of Plaintiff's Motion for an Award of Attorneys' Fees and Costs [#24-1] at 3. On March 8, 2011, the FEC acknowledged receipt of CREW's request and granted CREW's request for a fee waiver. Id.

Between March 9 and March 18, 2011, "the parties agreed that (1) CREW would allow the FEC to exclude certain documents from its initial search for responsive documents; and (2) the FEC would produce documents on a rolling basis." Citizens for Responsibility and Ethics in Washington v. Federal Election Com'n, 839 F. Supp. 2d 17, 20-21 (D.D.C. 2011), rev'd, 711 F.3d 180 (D.C. Cir. 2013) ("Crew I"). The parties continued to negotiate the scope of the request through at least April 4. Id. at 21. Then, on May 4, the FEC informed CREW that it had "received the first set of potentially responsive documents from its searches, was still performing searches, and was reviewing hundreds of potentially relevant documents." Id. According to CREW, the FEC said it would give the documents to CREW within two weeks. [#24] at 4; see also Declaration of Adam J. Rappaport [#6-1] at 3. In two subsequent conversations, the FEC told CREW that it was planning to release documents "as soon as possible." Declaration of Katie A. Higginbothom [#4-2] at 2. CREW filed the complaint in this action on May 23, 2011, because no document production had yet occurred. [#24-1] at 4.

The FEC ultimately did give three initial batches of documents to CREW on June 15, 2011, June 21, 2011, and June 23, 2011. [#24-1] at 4. While the first two releases were accompanied by letters stating that the released documents did "not constitute a final agency

decision" and that CREW would "continue to receive additional responsive records on a rolling basis," the June 23 release included a letter indicating that that release constituted a final production and was a final agency decision. Id. In total, "the FEC produced 835 pages of documents, withheld portions of 219 pages pursuant to Exemptions 2, 4, 6, and 7(C), deemed 25 pages non-responsive, and withheld an unknown number of records in their entirety pursuant to Exemption 6." [#24-1] at 5. Despite the production, CREW believed that the FEC failed to disclose replies to various e-mails, calendars and agendas for two of the three specified Commissioners, and "*ex parte* communications notices in the possession of an ethics official." [6-1] at 5.

On June 23, 2011, the same day that the FEC made its final production, it also made its first filing in this case: Defendant Federal Election Commission's Motion to Dismiss or, in the Alternative, for Summary Judgment [#4]. Judge Kollar-Kotelly ultimately granted the government's motion (which she construed as a motion for summary judgment) on December 30, 2011, because she accepted the government's argument that CREW had failed to adequately exhaust its administrative remedies before filing suit. See CREW I, 839 F. Supp. 2d at 28-29.

CREW appealed the dismissal, and the United States Court of Appeals for the District of Columbia Circuit reversed Judge Kollar-Kotelly. That court ruled that, "[b]ecause the FEC did not make and communicate a 'determination' within the meaning of 5 U.S.C. § 552(a)(6)(A)(i) within 20 working days of receiving CREW's FOIA request, CREW is deemed to have exhausted its administrative appeal remedies under Section 552(a)(6)(C)(i), and its suit may proceed." Citizens for Responsibility and Ethics in Washington v. Federal Election Com'n, 711 F.3d 180, 190 (D.C. Cir. 2013) ("CREW II").

Following the D.C. Circuit's ruling, Judge Kollar-Kotelly issued a Minute Order on June 12, 2013, ordering the parties to file "a joint status report proposing a schedule for proceeding in this matter" by June 26, 2013. The FEC filed two joint motions for extensions of time to respond to the court's Minute Order; the second asked for an extension because "[t]he parties [were] presently engaged in negotiations that may result in settlement, or at least a narrowing, of the issues before the Court." Joint Status Report and Motion for Extension of Time [#20]. After Judge Kollar-Kotelly granted these joint motions, the FEC filed a Joint Stipulation of Dismissal [#21], which Judge Kollar-Kotelly approved on August 13, 2013. See Order [#23].

Before the case was dismissed, but after remand from the D.C. Circuit, the parties began settlement discussions. These discussions resulted in the resolution of "all outstanding issues regarding the merits of CREW's FOIA request" on August 12, 2013. [#24] at 7; see also Defendant Federal Election Commission's Opposition to Plaintiff's Motion for Attorney's Fees [#29] at 13. This settlement involved "an additional search" for responsive documents by the FEC and an additional production of those documents; CREW characterizes this as the "additional search CREW sought from the start." Reply in Support of Plaintiff's Motion for an Award of Attorneys' Fees and Costs [#30] at 1, 4. The government does not dispute that it settled with CREW as to the merits of its request, but it emphasizes that this occurred "without any further action by the Court." [#29] at 13.

## II.  Legal Standard

FOIA provides that a "court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). To determine whether attorney's fees should be awarded in a FOIA action, a court must determine both whether the

plaintiff is "eligible" for attorney's fees and whether the plaintiff is "entitled" to attorney's fees. See Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 524 (D.C. Cir. 2011).

A plaintiff is only eligible for an award of attorney's fees if it has "substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). As amended through the OPEN Government Act of 2007, "a complainant has substantially prevailed if the complainant has obtained relief through either-- (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii).[3]

If a plaintiff is eligible for fees, the court must determine whether the plaintiff is entitled to reasonable fees based on four factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding." Judicial Watch v. FBI, 522 F.3d 364, 371 (D.C. Cir. 2008). While the first three factors "assist a court in distinguishing between requesters who seek documents for public informational purposes and those who seek documents for private advantage," the fourth factor requires the court to determine whether the government agency "has shown that it had any colorable or reasonable basis for not disclosing the material until after" suit is filed. Davy v. CIA, 550 F.3d 1155, 1160-63 (D.C. Cir. 2008). No one factor is dispositive, see id. at 1159, and a court must balance the factors to determine whether awarding a fee is appropriate. See id. at 1163.

If a court determines that a plaintiff is both eligible and entitled to attorney's fees, the court must exercise its "traditional equitable discretion" to determine what constitutes a reasonable fee. Fenster v. Brown, 617 F.2d 740, 742 (D.C. Cir. 1979). Courts in this circuit

---

[3] Thus, the statute approves for FOIA cases the "catalyst theory" that the Supreme Court had rejected in Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res., 532 U.S. 598 (2001).

"recognize that the 'usual method of calculating reasonable attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the "lodestar" amount.'" Judicial Watch, Inc. v. Bureau of Land Management, 562 F. Supp. 2d 159, 175 (D.D.C. 2008) rev'd on other grounds 610 F.3d 747 (D.C. Cir. 2010) (citing Bd. of Trs. of Hotel and Rest. Employees Local 25 v. JPR, Inc., 136 F.3d 794, 801 (D.C. Cir. 1998). Particularly when the plaintiff is represented by non-profit, public interest lawyers who do not have the types of hourly billing rates used by private law firms, the court should look to the *Laffey* matrix—"a schedule of charges based on years of experience"—to determine the reasonable hourly rates to calculate the "lodestar" amount. Judicial Watch, 562 F. Supp. 2d at 175 (citing Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983)).

## III. Legal Analysis

### A. CREW is Eligible for Attorney's Fees

The FEC[4] contends that CREW is not eligible for attorney's fees because CREW failed to satisfy either of the requirements that would make it eligible under 5 U.S.C. § 552(a)(4)(E)(ii). In the FEC's view, CREW did not obtain judicial relief on the merits of its claim: although the D.C. Circuit handed CREW a major procedural victory and resurrected CREW's lawsuit, neither that court nor the district court "issued any order in this case enjoining the Commission from withholding any records . . . or requiring the Commission to produce particular records." [#29] at 15-16. The FEC also believes that CREW's lawsuit failed to create a voluntary or unilateral change in its position because CREW cannot show that the "lawsuit was reasonably necessary and [that] the litigation substantially caused the requested records to be

---

[4] At oral argument before the D.C. Circuit, that court learned that the FEC "had never consulted [the Department of Justice] on the merits of the agency's position," and the court requested that the DOJ provide a supplemental brief expressing the views of the United States. See [24-1] at 5. On remand, the FEC continues to represent itself without an appearance from any DOJ attorney.

released." [#29] at 15-16 (citing <u>Burka v. HHS</u>, 142 F.3d 1286, 1288 (D.C. Cir. 1998)). In order for CREW to be eligible for attorney's fees, it need only show that it secured either an order, enforceable written agreement, or consent decree, or a voluntary or unilateral change in the FEC's position. <u>See</u> 5 U.S.C. § 552(a)(4)(E)(ii).

### 1.   CREW Has Substantially Prevailed Through a Judicial Order

On the first point, CREW and the government raise an interesting question of whether, under <u>Halperin v. Department of State</u>, 565 F.2d 699, 706 n.11 (D.C. Cir. 1977), a plaintiff can substantially prevail by obtaining a ruling that will force an agency to more fully comply with FOIA. In <u>Halperin</u>, the D.C. Circuit upheld a district court ruling that certain transcripts of a "background" (off the record) press briefing given by former Secretary of State Henry Kissinger were not properly classified and could not be withheld by the State Department on that basis. <u>Id.</u> at 704. However, the D.C. Circuit's ruling did not actually give the plaintiff the requested transcripts: the court remanded to determine if there were other reasons to withhold the briefing. <u>Id.</u> at 707.

As it relates to the present case, the key language of the opinion occurred in footnote eleven, where the court admonished the State Department for not thinking through the legal implications of maintaining transcripts of "background" press briefings. <u>Id.</u> at 706 n.11. The court noted that:

> Appellee, by virtue of his persistence, has at least benefited the nation by making the Department aware of the laws it must observe if these adventures are to be continued. It would thus appear that appellee has, irrespective of the outcome of the proceedings on remand, "substantially prevailed" within the meaning of 5 U.S.C. § 552(a)(4)(E) (Supp. IV 1974) relating to the assessment against the United States of litigation expense, thereby fulfilling one of the conditions for the invocation of possible disciplinary proceedings under 5 U.S.C. § 552(a)(4)(F) (Supp. IV 1974).

<u>Id.</u>

The FEC characterizes this footnote as "pure dicta" that "did not hold that the plaintiff was a substantially prevailing party." [#29] at 17. This contention is incorrect. The D.C. Circuit unequivocally communicated both to the parties and the district court that the plaintiff—by making the agency aware of the laws it must observe—had substantially prevailed and was entitled to fees "irrespective of the outcome of the proceedings on remand." Halperin, 565 F.2d at 706 n.11. Thus, even if the district court ultimately decided that the agency could withhold the documents, the plaintiff would *still* be entitled to fees. As a result, there is a subset of FOIA cases where plaintiffs are eligible for attorney's fees based solely on winning on a legal issue that "make[s] the Department aware of the laws it must observe"—irrespective of whether the agency is ultimately compelled to produce documents. Id.

Furthermore, the D.C. Circuit affirmed this holding in Cotton v. Heyman, 63 F.3d 1115, 1120 (D.C. Cir. 1995). In Cotton, the plaintiff incorrectly relied on Halperin for the related—but distinct—issue of whether he was entitled to fees. The court noted that, in Halperin, it "only addressed the issue of whether Halperin was a 'prevailing party' under FOIA, and thus potentially eligible to collect fees." Id. Thus, although the plaintiff's "characterization of [the court's] dicta is on one level correct," it was irrelevant to the issue before the court in Cotton of entitlement to fees once eligibility was established. Id.; see also Church of Scientology of California v. Harris, 653 F.2d 584, 589 (D.C. Cir. 1981) (characterizing Halperin as "Plaintiff substantially prevails when its litigation benefits the nation by making an agency aware of the duties imposed upon it by FOIA (dicta).").

CREW has met the Halperin burden in this case. The basis of Judge Kollar-Kotelly's grant of summary judgment was that CREW had failed to exhaust administrative remedies because the FEC had made a sufficient "determination" within the statutory period. CREW I,

839 F. Supp. 2d at 25-26. However, the D.C. Circuit subsequently held that the FEC's so-called "determination" failed to actually constitute a "determination" under FOIA because it failed to both "immediately 'notify the person making such request of such determination *and the reasons therefor*'" and "immediately notify the requester of the right 'to appeal to the head of the agency any adverse determination.'" <u>CREW II</u>, 711 F.3d at 186 (citing 5 U.S.C. § 552(a)(6)(A)(i)) (emphasis in original). As a result, the court made clear that the Catch-22 created by the FEC was illegal because FOIA prohibited responding "to a request within 20 working days in terms not susceptible to immediate administrative appeal—by simply stating, in essence, that it will produce documents and claim exemptions over withheld documents in the future." <u>Id.</u> Otherwise, "the agency could process the request at its leisure, free from any timelines" and immune from suit. <u>Id.</u>

By obtaining its ruling in this case, CREW informed the FEC of its legal obligations to give a "determination" within twenty work days. For each FOIA request, it must "(i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." <u>Id.</u> at 188. By obtaining a court order validating its position and providing instruction to the FEC, CREW is eligible for attorney's fees under <u>Halperin</u>.

### 2. CREW Has Substantially Prevailed By Causing a Voluntary Change in the FEC's Position

According to the FEC's version of events, it intended all along to provide CREW with all of the documents that it ultimately produced, including those that were part of the settlement. Thus, even if CREW had not filed suit, it would have received precisely the same records, and its lawsuit was not the "catalyst" that led to the document releases.

The key question under the "catalyst" theory is whether "the institution and prosecution of the litigation cause[d] the agency to release the documents obtained during the pendency of the litigation[.]" Church of Scientology, 653 F.2d at 587. In other words, a plaintiff must show that "prosecution of the action could reasonably be regarded as necessary to obtain the information, and that a causal nexus exists between the action and the agency's surrender of that information." Id. at 588 (internal citations omitted); see also Calypso Cargo, Ltd. v. U.S. Coast Guard, 850 F. Supp. 2d 1, 4 (D.D.C. 2011). While an agency "cannot prevent an award of attorney's fees simply by releasing the requested information before the plaintiff obtains a court order, 'the mere filing of the complaint and the subsequent release of documents is insufficient to establish causation.'" Calypso Cargo, 850 F. Supp. 2d at 4 (citing Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1496 (D.C. Cir. 1984)).

The FEC's argument—premised on the "catalyst" theory—must fail when confronted with the record for one glaring reason: the FEC and CREW settled on August 12, 2013, more than two years after suit was filed and four months after the D.C. Circuit's April 2, 2013, opinion. As explained above, that settlement encompassed an additional search by the FEC for responsive documents and an additional release of documents.[5] If CREW had sued the FEC and received all of the documents within one month of the suit, then this case may have been more like Calypso Cargo or Bigwood v. Defense Intelligence Agency, 770 F. Supp. 2d 315, 321 (D.D.C. 2011), the two cases to which the FEC analogizes this matter. In each of those cases, however, the government agency simply completed a rolling document production that, while delayed, was under way at the time that suit was filed; under those circumstances, filing suit did not cause any change in the government's position. See Calypso Cargo, 850 F. Supp. 2d at 5-6;

---

[5] It is not clear from the record whether the settlement also resulted in the FEC releasing documents or portions of documents that had been previously redacted in full or in part.

see also Bigwood, 770 F. Supp. 2d at 321. That also happened in this case in June 2011, but the case did not stop there. Instead, CREW had to overcome an unfavorable decision in the district court before settlement discussions began, culminating in an agreement with the FEC. Thus, the August 12, 2013, settlement provided CREW with additional relief, but only after its victory in the court of appeals produced the change in the position of the FEC—which had done nothing while the appeal was pending.

### B. CREW is Entitled to Attorney's Fees

#### 1. CREW's Lawsuit Served a Public Benefit

While the "release of any government document benefits the public by increasing its knowledge about the public," a sufficient public benefit for an award of attorney's fees exists only "where the complainant's victory is likely to add to the fund of information that citizens may use in making vital political choices." Cotton, 63 F.3d at 1120 (internal citations omitted). The FEC claims that these documents have not benefited the public. See [#29] at 23. In support of its argument, it mischaracterizes a Bloomberg BNA news article about the document release as inconsistent with CREW's position that the documents "shed light on the propriety of government conduct and the influences brought to bear on government officials." Id. That article, however, makes clear that, while the documents did not reveal instances of attempts to influence commissioners, they "did provide a glimpse of the internal workings of an agency viewed by critics as gridlocked along party lines and dysfunctional" and "showed close ties between commissioners and election lawyers practicing before the FEC." Documents Show Partisan Fights at FEC Encouraged by Advocates Outside Agency, Bloomberg BNA, Sept. 25, 2013.[6] It is evident from the FEC's own citation that CREW's FOIA lawsuit has "add[ed] to the fund of information that citizens may use in making vital political choices" because the documents have

---

[6] Available at http://gallery.mailchimp.com/d77d4a197583f647063d7317c/files/BNAFECFoias.pdf.

helped better explain the inner workings of the FEC—an agency with the important power to regulate elections to ensure they are fair and free. This unquestionably benefits the public.

### 2. CREW Derived No Commercial Benefit

The government does not substantively contest this prong; instead, it reminds the Court that CREW's non-profit status is not dispositive for determining whether it is entitled to attorney's fees. See [#29] at 24. Thus, this prong is effectively conceded.

### 3. CREW's Interest in the Records

The government does not contest this prong, and it is therefore conceded.

### 4. The FEC's Withholding Was Not Sufficiently Reasonable

Under Davy, this Court must consider both 1) "whether the agency's opposition to disclosure had a reasonable basis in law"; and 2) "whether the agency 'had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'" 550 F.3d at 1162 (quoting LaSalle Extension Univ.  v. FTC, 627 F.2d 481, 486 (D.C. Cir. 1980). Davy's quotation of LaSalle is unfortunate because the quote was incomplete and—standing alone—creates confusion. In LaSalle, the court held that, "to rebut a claim of Government unreasonableness or obduracy, the Government need not prove that the information was in fact exempt, only that the Government had a reasonable basis in law for concluding that the information in issue was exempt and that it had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." 627 F.2d at 486 (internal quotations and citations omitted). As Davy later clarified, the burden is on the government. The plaintiff need not show "that the agency was unreasonable." Davy, 550 F.3d at 1163. Instead, the government must show that "it had any colorable or reasonable basis for not disclosing the material until after" the plaintiff filed suit. Id.

The FEC is thus plainly wrong to argue that CREW cannot show that it was unreasonable, recalcitrant, or engaged in obdurate behavior. <u>See</u> [#29] at 25. On this prong, what CREW can or cannot show is irrelevant. As <u>Davy</u> makes clear, it is a question of what the FEC can show.

The government is in good company, though, as CREW also misses the point. CREW argues that the failure to provide a "determination" within the statutory period was unreasonable. [#24-1] at 14. This is irrelevant. Instead, the question is whether the FEC's withholding of documents was reasonable. There were ultimately two batches of documents released—those that were released shortly after suit was filed and those released in conjunction with the settlement agreement two years later, and they are addressed in turn.

With respect to the documents released shortly after suit was filed, the FEC contends that it acted reasonably because it intended to release the documents all along. [#29] at 25. This Court agrees that, at the very least, the FEC acted reasonably. While it was understandably frustrating to CREW that the FEC was unable to abide by its deadlines, the agency did release over eight-hundred pages of responsive records within three months. [#24-1] at 4-5. The reality of FOIA offices is that they are underfunded and understaffed; three months, while slow, was not unreasonably slow. This timeframe, combined with the declarations of Nicole Matthis and Katie Higginbothom, convinces the Court that the government did act reasonably and in a manner that was not obdurate. <u>See</u> <u>Declaration of Nicole St. Louis Matthis</u> [#4-1]; <u>see</u> <u>also</u> [#4-2].

The documents released in conjunction with the settlement agreement are an entirely different story. Confronted with the D.C. Circuit's opinion and the realization that CREW's lawsuit would continue, the FEC folded: it provided no legal justification—reasonable or otherwise—for its refusal over the preceding two years to release those additional documents. It

is impossible to believe that the FEC intended all along to give these documents to CREW. If that were the case, why did the FEC wait over two years before doing so? The FEC either unlawfully withheld records that it knew were responsive to CREW, or it stalled doing what it was supposed to do for no good reason.

Indeed, the FEC prevailed in the district court solely on the grounds of CREW's failure to exhaust administrative remedies. At any time within the intervening two years, the FEC could have mooted the appeal by producing the documents. Moreover, win, lose, or draw, the FEC would have had to produce the documents eventually: had it won on appeal, CREW would have needed only to exhaust whatever administrative remedy the FEC imposed before the FEC would have to turn over the documents. While the FEC had the right, as does any litigant, to resist an appeal from a judgment that favored it, it has to accept the consequences of losing and the reality that its doing so caused CREW to expend the legal fees it did to win the appeal. Having decided to proceed in that fashion, it is unconscionable to refuse to pay the attorney fees it caused CREW to expend to defeat the FEC's resistance to producing the documents.

Finally, lest the FEC claim that it is being punished for defending a district court judgment that favored it, it must recall that the court of appeals rejected in its entirety the FEC's argument on appeal and accepted all of CREW's arguments without dissent. This case is thus reduced to an agency that misread the statute, relied on an appeal from a lower court as a reason to do nothing until that appeal was resolved against it, and then produced the documents it should have produced two years earlier had it not misinterpreted FOIA. If fees are not available in this situation, where a party is compelled to press an appeal to get what the FEC claims it would have given in the first place, then the fee provision of FOIA is rendered nugatory in a case where it is needed most.

14

* * *

This Court must balance the above factors to determine CREW's entitlement to attorney's fees. The FEC concedes two of the points, and it is clearly incorrect about the public benefit from the release of the records. Finally, the release of the documents two years later can only be justified by the FEC's defense of a losing appeal. While hindsight is always twenty-twenty, it is clear that the release of the documents two years earlier would have saved CREW, this Court, and the FEC itself the time and trouble it took to get the FEC to do what it should have done in the first place. Considering the four factors as a whole, CREW is entitled to reasonable attorney's fees in this matter.

## C.  The Attorney's Fees CREW Seeks are Reasonable

The FEC makes numerous arguments about why CREW's requested fee of $139,998.68 should be significantly reduced. It does not, however, argue that the rate at which CREW seeks reimbursement, based on the *Laffey* matrix, is inappropriate. Thus, the only question is whether the number of hours CREW expended in prosecuting this matter—which the Court calculates to be 296.86 hours[7]—is reasonable.

### 1.  CREW Should Obtain a Fee for Its Appeal

The FEC first argues that CREW should not be reimbursed for any hours spent either opposing its motion to dismiss/motion for summary judgment or appealing Judge Kollar-Kotelly's order. CREW had accrued only $3,825 in fees by the time the first group of documents were released on June 23, 2011; any amount of fees over this number were "derive[d] exclusively from work concerning the procedural issue it litigated before the court of appeals."

---

[7] CREW's failure to provide subtotals and totals for the hours sought is mystifying. As a result, the Court was forced to do its own calculations. Weissmann seeks 187.5 hours in the initial motion and an additional 29.86 hours in the reply, for a total of 217.36; Rappaport seeks 50.4 hours in the initial motion and an additional 3.85 hours in the reply, for a total of 54.25; and Sloan seeks 23.75 hours in the initial motion and an additional 1.5 hours in the reply, for a total of 25.25. All told, this amounts to 296.86 hours.

Not only was that work unrelated to obtaining the requested records, it had no effect on the legal relationship between CREW and the Commission in this litigation." [#29] at 36. After Judge Kollar-Kotelly's ruling dismissing the case, however, CREW and the FEC had *no* legal relationship because the case had been dismissed. Only after CREW prevailed at the D.C. Circuit did the parties once again have a legal relationship that permitted CREW to demand compliance with FOIA. Immediately thereafter, the CREW and the FEC settled: the FEC produced additional documents. The FEC cannot fairly claim that CREW should not receive attorney's fees for the time CREW spent on its winning appeal. If CREW had not done so, it would not have received the additional documents. Thus, its appeal was essential in obtaining its ultimate relief.

### 2.   CREW's Requested Fee Is Not Objectively Unreasonable

Next, the FEC argues that recovering more than $120,000 for an appeal to the D.C. Circuit "would be grossly out of step for a matter almost exclusively consisted of presenting legal arguments to this Court and the court of appeals about a narrow, unsettled procedural question of FOIA law." [#29] at 37. This is, in essence, a claim that CREW's hours were objectively unreasonable and excessive. The cases cited by the FEC do not, however, address this point.

The FEC first cites CREW v. Department of Justice, 825 F. Supp. 2d 226, 233 (D.D.C. 2011) ("Crew v. DOJ"), because that case "span[ed] more than 18 months," CREW used two attorneys to litigate it, and "was ultimately awarded fees of $11,917.50." [#29] at 37. These claims are highly misleading. A review of the docket—and of the government's own citation— shows that: 1) CREW filed suit seeking Office of Legal Counsel opinions; 2) the parties jointly

16

agreed to not file dispositive motions until the DOJ had processed CREW's request;[8] 3) Judge Richard Leon ordered production by a certain date; and 4) the parties then jointly agreed to dismiss the case a year after the initial filing.[9] Then, *thirteen* months after the initial filing, CREW moved for an award of $13,978 in attorney's fees. Unlike the case at bar, that litigation involved no dispositive motions, no substantial briefing (aside from the motion for attorney's fees), and no appeals involving procedural rulings affecting all FOIA requests.

The FEC next cites <u>CREW v. Department of Homeland Security</u>, Civil Case No. 08-1046, 2010 WL 8971920 (D.D.C. Apr. 21, 2010) ("<u>CREW v. DHS</u>"), because that case, which "was nearly two years old by the time of the court's fee award," utilized three attorneys yet resulted in a fee award of only $44,924.40. Once again, actually reviewing the docket shows that the two cases are quite different: 1) CREW filed that case on June 18, 2008;[10] 2) opposed a motion for disclosure;[11] 3) filed a fifteen-page opposition to a motion for partial summary judgment;[12] 4) filed an eight-page reply brief;[13] 5) opposed a stay requested by the government;[14] and 5) filed its motion for attorney's fees on January 29, 2010.[15] Thus, aside from the motion for attorney's fees, CREW was engaged in only one other substantive motion—a brief opposition and cross-motion for partial summary judgment. Once again, it is evident from

---

[8] See <u>Joint Status Report</u> [#5], Civil Case No. 10-750 (D.D.C July 12, 2010).

[9] See <u>Joint Stipulation of Dismissal</u> [#6], Civil Case No. 10-750 (D.D.C June 9, 2011).

[10] See <u>Complaint</u> [#1], Civil Case No. 08-1046 (D.D.C. June 18, 2008).

[11] See <u>Plaintiffs' Opposition to Defendant's Motion for Disclosure Schedule</u> [#18], Civil Case No. 08-1046 (D.D.C. Nov. 6, 2008).

[12] See <u>Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment in Part, and in Support of Plaintiff's Cross-Motion for Summary Judgment in Part</u> [#25], Civil Case No. 08-1046 (D.D.C. Jan. 5, 2009).

[13] See <u>Reply Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment in Part</u> [#31], Civil Case No. 08-1046 (D.D.C. March 5, 2009).

[14] See <u>Plaintiff's Opposition to Defendant's Motion for Stay Pending Appeal of September 1, 2009 Order</u> [#41], Civil Case No. 08-1046 (D.D.C. Nov. 5, 2009).

[15] See <u>Plaintiff's Motion for an Award of Attorneys' Fees and Costs</u> [#50], Civil Case No. 08-1046 (D.D.C. Jan. 29, 2010).

the record that CREW did not request as large of a fee as it has in this matter because it did not engage in the same type of substantive legal contest that it did here.

Finally, the FEC cites <u>Tax Analysts v. Internal Revenue Service</u>, Civil Case No. 94-923, 1998 WL 283207 (D.D.C. Mar. 17, 1998), which it analogizes as a "FOIA appeal before the Court of Appeals that covered a similar time period" yet the plaintiff "expended only 87.65 attorney hours to substantially prevail" and was awarded a fee of "$27,061.94." [#29] at 37. By contrast, CREW seeks reimbursement for a total of 296.86 hours. This is, however, a false comparison. On June 3, 1996, Judge Gladys Kessler awarded Tax Analysts $120,769 in attorney's fees. <u>See</u> <u>Order</u> [#80], Civil Case No. 94-923 (D.D.C. June 3, 1996). Nearly two years later, on March 17, 1998, Judge Kessler gave an *additional* award of $27,061.94 after the plaintiff prevailed on appeal. Thus, the FEC's contention that CREW's sought fees "dwarf[] these comparable matters several times over" is false, as CREW seeks a total of $139,998.68, and—at a similar point in litigation—Tax Analysts had received a total of $147,830.94. [#29] at 37.

As the government suggested, though, it is more appropriate to compare the number of hours expended on appeal. William Dobrovir, the solo attorney who litigated <u>Tax Analysts</u>, expended 87.65 hours as the attorney for the appellee before the D.C. Circuit. <u>See</u> <u>Declaration of William A. Dobrovir</u> [#89-1], Civil Case No. 94-923 at 2 (D.D.C. Sept. 16, 1997). In contrast, here, Weissmann billed 138 hours, Rappaport billed 35.2 hours, and Sloan billed 13 hours. The total amount—182.2 hours—is nearly twice as much as Dobrovir's. However, there are significant differences. CREW's attorneys expended 39.8 hours on a reply brief, something that Dobrovir, as appellee's counsel, did not have to prepare.[16] CREW's attorneys also expended

---

[16] This figure does not include the time each attorney took to review the FEC's brief, which would have occurred whether CREW was appellant or appellee.

14.5 hours preparing a supplemental brief that was needed after the D.C. Circuit learned that the

FEC had proceeded without consulting the Department of Justice. Subtracting these amounts,

CREW expended a total of 127.9 hours on the appeal, which is 40.25 hours more than Dobrovir

expended in 1996 and 1997. See Attorney Time [#89-2], Civil Case No. 94-923 (D.D.C. Sept.

16, 1997). This difference does not "dwarf[]" the hours that Dobrovir spent, and it is certainly

not objectively unreasonable.

### 3.   The Nature of the Case Explains CREW's Deviation from Templates

The FEC criticizes CREW for not acting as efficiently as it should, given how frequently

CREW files FOIA lawsuits, and the FEC believes that CREW should have its fee docked for not

using "document templates." In particular, the government notes that CREW "expended less than

$2,000 worth of fees to file its complaint," an "appropriate" figure because CREW uses a model

pleading. [#29] at 37. However, the FEC criticizes CREW for not utilizing such "efficiencies"

for "other routine papers in the case . . . such as the instant fee petition, for which CREW seeks

more than $12,000." Id. at 37-38. Given that the only other major filings in this case were

oppositions to the government's motion to dismiss/motion for summary judgment and appellate

briefing, the FEC cannot criticize CREW for not using a base template; CREW was not drafting

a lease. This case presented novel legal issues that required substantial analysis and advocacy.

No competent lawyer would use a "template" with generic information about FOIA to file

substantive briefing. Similarly, the attorney's fees petition reflects the novelty of these legal

issues because it is unique to the facts of this case and has to accurately reflect both the factual

background and the way that the legal battles over the preceding two years contributed to the

eligibility, entitlement, and appropriateness of a fee award. This was not a "routine" filing. The

fact that CREW reduced the number of hours needed to file its complaint by using a standard

template only undermines the FEC's argument, as it makes evident CREW's willingness to save time and expenses where possible. The FEC's contention on this point lacks any merit.

### 4.   CREW Has Not Under-Delegated Attorney Work

To the FEC, one of the drivers of CREW's large fee is its "inappropriate staffing" because research performed by Weismann "regarding the legislative history of FOIA would most reasonably have been performed by someone with less than twenty years of experience, such as Mr. Rappaport." [#29] at 38. CREW, however, counters that Weismann did the "majority of the appellate work" to "limit[] the number of hours necessary to pursue the appeal given her extensive FOIA experience." [#24-1] at 20. Once more, this Court is confronted with the tension between "under delegation" and "over delegation." See M.R.S. Enterprises, Inc. v. Sheet Metal Workers' Int'l Ass'n, Civil Case No. 05-1823, 2007 WL 950071, at *3 (D.D.C. Mar. 29, 2007); Palmer v. Rice, Civil Case No. 76-1439, 2005 WL 1662130, at *1 (D.D.C. July 11, 2005).

Under delegation occurs when a senior lawyer, billing at a high rate, does work that could have done by a junior lawyer at a lower rate.  Obviously, confirming that under delegation has occurred requires an inquiry into the nature of the work.  If the work did not require any legal skill and was instead clerical, then, at most, it should be reimbursed only at a clerical rate.  Of course, it would not be appropriate to reimburse lawyers at their standard rates for "filing" a document with the court or standing over a copying machine.  Over delegation is the converse, occurring when a task is delegated to a junior lawyer or a para professional, who then proceeds to take much more time performing the task than it would have taken a more senior lawyer. The only way to address this issue is for the Court to examine what was done, who did it, and whether it could have been done more efficiently and cheaply if performed by someone billing at a lower rate.

That said, the FEC does not actually criticize any specific entries in CREW's time records. Instead, it argues generally that CREW had more "top-heavy staffing" than a for-profit law firm and that, "[w]hile CREW is not obligated to hire or use a litigation staff that resembles a typical firm practice, the reasonableness of its fees should be assessed in that context." [#29] at 38. In other words, the FEC wants this Court to penalize CREW for creating a legal team of veteran, experienced litigators who are the most capable of representing their client's interests. This Court declines to do so. Moreover, the FEC has failed to provide this Court with any evidence of what type of staffing constitutes, in its mind, a "typical law firm" and how the experience levels of litigators taking a case to the D.C. Circuit would differ between CREW and this "typical law firm."

The other objection regarding under delegation is that if Weismann and Rappaport "themselves performed clerical tasks such as making copies of filings due to the absence of a paralegal or other staff, that does not entitle them to reimbursement for those tasks at their full rates. The same should be true of basic legal research." [#29] at 38-39. Once again, the FEC wants CREW penalized without providing this Court with any context for that penalty. What constitutes basic legal research? The FEC provides no explanation. CREW's motion states that its attorneys "extensively research[ed] the legislative history of FOIA from its inception to the present." [#24-1] at 21. Given that navigating legislative history and understanding how a statute has evolved over the past forty years can be a perilous undertaking, this Court does not view it as "basic legal research." Furthermore, the FEC has provided the Court with no information about what kind of research it performed when this case was on appeal, how many hours it expended on this matter, and how senior its attorneys were. What is clear is that CREW filed a thirty-nine

page brief[17] and a twenty-five page reply brief,[18] both of which contained extensive briefing on D.C. Circuit precedent and the legislative history and purpose of FOIA. This was hardly a run-of-the-mill FOIA case, as the record—and CREW's victory before the D.C. Circuit—clearly demonstrates.

### 5.  CREW Correctly Billed for Reviewing Documents

Rappaport expended 2.5 hours, for a total of $875, reviewing documents released by the FEC in June 2011. The FEC contends this is unacceptable under CREW v. DOJ. The FEC fails to provide a theory for why it is unacceptable in this case, but the FEC presumably objects because CREW would have ultimately reviewed the documents regardless of whether it filed suit. In Judge James Boasberg's opinion in CREW v. DOJ, CREW could not recover a fee for reviewing the documents it obtained through litigation because that litigation "concerned CREW's demand for and DOJ's withholding of certain documents. CREW received the relief it sought when the documents were produced, and the time Plaintiff expended reviewing the documents . . . was a post-relief activity, separate from the litigation." 825 F. Supp. 2d at 231 (internal citations and quotations omitted). Furthermore, because a plaintiff would review the documents even if litigation were not needed—the point of the FOIA request is, after all, to obtain the release of documents—a requester should not able to recover for that time. Id.

Judge Boasberg's ruling contrasts with that of Judge Ricardo Urbina, who held that "it would seem critical to the prosecution of a FOIA lawsuit for a plaintiff to review an agency's disclosure for sufficiency and proper withholding during the course of its FOIA litigation." Electronic Privacy Information Ctr. v.Dep't of Homeland Security, 811 F. Supp. 2d 216, 240-41

---

[17] See Brief of Appellant, No. 12-5004, 2012 WL 2114853 (D.C. Cir. June 11, 2012).
[18] See Reply Brief of Appellant, No. 12-5004, 2012 WL 3027136 (D.C. Cir. July 24, 2012).

(D.D.C. 2011). Judge Urbina thus awarded fees related to the plaintiff's review of DHS's disclosures.[19]

This Court agrees with Judge Urbina's conclusion. In this case, the materials that were initially produced included "withheld portions of 219 pages pursuant to Exemptions 2, 4, 6, and 7(C)." [#24-1] at 5. While it is certainly true that CREW would have reviewed the documents even if it were not in active litigation, the fact remains that it *was* in litigation against the FEC over the same FOIA request. Only by reviewing the documents would it know whether to challenge the exemptions or know whether all of the documents had even been produced. This was not a "post-relief activity."

### 6.   CREW's Timekeeping Practices Are Acceptable

#### a.   CREW Did Not Reconstruct Time Records Post Hoc

In the past, CREW has been criticized for "inadequate timekeeping habits," even when it "was aware it would be seeking a fee award." See CREW v. DOJ, 825 F. Supp. 2d at 230; see also CREW v. DHS, 2010 WL 8971920, at *2 ("Many of the time records lack the adequate detail that would permit the Court to evaluate whether CREW's fee request is justified . . . Moreover, CREW's attorneys have not produced contemporaneous billing records . . ."). The FEC thinks that CREW is continuing its bad habit of submitting "reconstructed timesheets" because it has failed to "provide any contemporaneous records." [#29] at 33. The FEC, however, is plainly wrong on this point.

---

[19] The FEC does not even discuss this case despite its prominent citation by Judge Boasberg a mere eight days later in his Order denying CREW's motion for reconsideration. See Order [#18], Civil Case. No. 10-750 at 2 (D.D.C. November 29, 2011) ("Second, even if Judge Ricardo Urbina's decision . . . is inconsistent with this Court's determination regarding time spent reviewing documents, such decision is not binding and does not alter the Court's judgment. These documents were what CREW sought; if DOJ had initially produced them without litigation, CREW would still have spent the time reviewing them.")

In CREW v. DOJ, Weissmann wrote in her declaration that she "maintain[ed] daily time sheets. These records indicate the number of hours (and in some cases half-hour increments) [she had] spent on specific cases, but [sic] do[es] not itemize the specific tasks [she] performed for each of those cases." Declaration of Anne L. Weismann [#7-2], Civil Case. No. 10-750 at 60 (D.D.C. June 8, 2011). To calculate her hours for the fees petition, she "reviewed the hours [she] spent on the case in coordination with the docket sheet, [her] case files, and periodic notes of daily activities that [she] maintain[ed] on [her] calendar, all of which informed [her] as to the specific matter pending on a date on which [she] had expended time. For example, knowing the parties had filed a joint status report with the Court on July 12, 2010, allows [her] to attribute the time [she] spent on this case in the days preceding July 12, 2010 to that task." Id. at 60-61. Weismann's attached timesheet had aggregate entries across multiple days such as "5/23-5/26/11, 6/3-6/6/11 Research and draft motion for attorneys' fees and costs 7 [hours]." Id. at 62. In other words, Weissmann's declaration made it clear that she engaged in post hoc reconstruction of her hours based on a combination of her timesheets, notes, and the docket; no detailed contemporaneous records were kept, only aggregate totals, and even the reconstructed records conflated multiple days' worth of work. Judge Boasberg reduced CREW's fee by 37.5% by "splitting the 75% difference between billing in quarter-hour versus full-hour increments" to "account for any inaccuracies and overbilling that may have occurred as a result of its unacceptable timekeeping habits." CREW v. DOJ, 825 F. Supp. 2d at 231.

In CREW v. DHS, Weissmann submitted a declaration that contained nearly identical sections See Declaration of Anne L. Weismann [#50-4], Civil Case No. 8-046 at 1-2 (D.D.C. Jan. 29, 2010). However, her timekeeping was even worse than in CREW v. DOJ because she provided no specific dates and grouped multiple entries together, such as "Research, draft, and

final prep of plaintiff's opposition and cross-motion for SJ; confer w/ co-counsel 2.5 [hours]." Id. at 4. Judge John Bates reduced CREW's fees by 10%. See CREW v. DHS, 2010 WL 8971920, at *2.

In the case at bar, Weismann's declaration is far different. Nothing suggests that she submitted "reconstructed timesheets." Instead, she states that, in preparing the motion, she "reviewed [her] daily time sheets and separate notes [she] maintain[ed] on individual cases. Exhibit 1 to this declaration contains a break-down of [her] time by day on specific litigation activities in this case at both the district court and court of appeals level." [#24-2] at 4. This is a far cry from previous declarations, where Weismann indicated that she estimated her time based on her notes and the docket. Furthermore, each individual timesheet entry in the current case denotes only one specific day and one specific activity, such as "5/3/12 Research for brief 1.5 [hours]." Id. at 7. It appears to the Court that, having twice been admonished by judges of this court for failing to keep appropriate, contemporaneous time records, Weismann has reformed her practices.[20]

Although the FEC thinks that "at least $727.50 is claimed" on August 28, 2013, by Rappaport for "post-hoc reconstructions," the FEC confuses the entry "calculate hours for fee petition" with "post-hoc reconstruction." Compare [#29] at 38 n.16 with [#24-2] at 15. However, Rappaport could not have reconstructed 54.25 hours' worth of fees in a mere .5 hours. "Calculate hours for fee petition" merely means "add hours together."

---

[20] Although this has only been a discussion of Weismann, both Rappaport and Sloan have similarly followed appropriate methods of contemporaneous time record reporting. See [#24-2] at 12 ("In order to determine my time for purposes of recovering our fees in this matter, I reviewed my time sheets."); see also [#24-2] at 19 (Sloan stating the same).

### b.  CREW's Time Intervals Are Not Too Large

There is unquestionably a preference for time records that are at most quarter-hour increments. See Thomas ex rel. A.T. v. District of Columbia, Civil Action No. 03-1791, 2007 WL 891367, at *4 (D.D.C. Mar. 22, 2007) ("Courts in this district have reduced attorneys' fees on the grounds that billing increments smaller than quarter-hours is [sic] more accurate."). The reason for this preference is to avoid "any inaccuracies and overbilling" that may occur as a result of "unacceptable timekeeping habits." CREW v. DOJ, 825 F. Supp. 2d at 231. However, various courts have allowed larger billing increments. See Oil, Chemical & Atomic Workers Intern. Union, AFL-CIO V. U.S. Dep't of Energy, 141 F. Supp. 2d 1, 11-12 (D.D.C. 2001), rev'd on other grounds 288 F.3d 452 (D.C. Cir. 2002) (plaintiff's use of "whole numbers" was appropriate where the defendant did not specify "excessive or unwarranted" entries and the attorney affirmed that he recorded hours on the days on which they were incurred).

Here, the FEC has accused CREW of using "inflated time increments" because the timesheets "almost exclusively record time in hour or half-hour increments." [#29] at 34. The sworn declarations of CREW's three attorneys, however, state that they actually *reduced* their hours specifically to avoid seeking compensation for an inflated number of hours: Weismann "often reduced hours assigned to a specific litigation task by 10 percent. [She] made this reduction to avoid redundancy, given that many of the litigation tasks involved more than one attorney," [#24-2] at 5. Similarly, Rappaport "reduced [his] hours assigned to some of the specific litigation tasks for which CREW seeks fees," [#24-2] at 13, and Sloan "typically reduced [her] hours assigned to a specific litigation task." [#24-2] at 20. As is further explained in its memorandum, CREW's attorneys "exercised billing judgment by reducing hours claimed for preparing briefs at both the district and appellate court levels, especially those involving multiple

attorneys, to account for unnecessary duplication." [#24-1] at 20. Thus, while most of the billing entries are reported to the Court in half-hour increments, CREW's attorneys have done so only because they reduced the amount of time that they seek.

In light of this practice, it is evident that concerns about "inaccuracies and overbilling" that may be present in other cases are not present here. Ordinarily, shorter time increments are needed so that, if a lawyer performs a short task such as a fifteen minute phone call, that attorney is not rounding up and billing for a full half-hour. By affirmatively reducing their bills for most entries—while maintaining one-tenth hour entries for others, see generally [#24-2] at 15-16— there is no risk that CREW has inflated the time it spent on specific tasks. Furthermore, the FEC has identified no specific time entries for which it believes CREW is reporting more time than was necessary to complete the task. As discussed above, the FEC believes that CREW, in aggregate, spent too much time litigating this case, but it has not highlighted a single entry. As such, CREW should not be penalized and its award of attorney's fees should not be diminished.

### c.  CREW's Timesheet Entries are Sufficiently Specific

The government's final argument is that the descriptions of most entries on CREW's timesheets are insufficiently detailed and CREW must be penalized. Although the government once again cites CREW v. DHS, those entries, as discussed above, had no specific dates and grouped multiple entries together, such as "Research, draft, and final prep of plaintiff's opposition and cross-motion for SJ; confer w/ co-counsel 2.5 [hours]." Declaration of Anne L. Weismann [#50-4], Civil Case No. 8-1046 at 4 (D.D.C. Jan. 29, 2010). The entries in the present case far different: each line lists a specific activity and is linked to a specific date. There is no reason to reduce CREW's fee award.

However, Role Models America, Inc. v. Brownlee, 353 F.3d 962 (D.C. Cir. 2004),

suggests otherwise. In that case, a law clerk's time entries were "identical one-line entr[ies],

'[r]esearch and writing for appellate brief,' on eight consecutive weekdays: the clerk billed 8.25,

6.25, 7.25, 8.25, 7.25, 4, 8, and 4.25 hours on those days. Such generic entries are inadequate to

meet a fee applicant's 'heavy obligation to present well-documented claims.'" Id. at 971 (citing

Kennecott Corp. v. EPA, 804 F.2d 763, 767 (D.C. Cir. 1986) (per curiam)). This holding

indicates that successive entries such as "5/9/12 Research and draft brief 4 [hours]" are

insufficient and must be discounted.

It is clear, however, that several judges on this court have narrowly interpreted Role

Models:

> As Judge Kessler has pointed out, the opinion in Role Models "must be viewed in
> context"—an extraordinarily high bill for a garden variety case. Smith v. District
> of Columbia, 466 F.Supp.2d 151, 157 (D.D.C.2006). "[T]he ruling in Role
> Models simply cannot be blindly applied without being mindful of the factual
> context in which it was decided." Id. at 158; see also DL v. District of Columbia,
> 256 F.R.D. 239, 246 (D.D.C.2006 [2009]) (when fee request is "unreasonable on
> its face," as in Role Models, the court should scrutinize time records "with a more
> demanding eye"). In Role Models, counsel expended minimal effort—as the case
> required "no discovery, no travel, no evidentiary hearings, no contested facts, and
> no petitions for rehearing"—yet requested fees dramatically disproportionate to
> the work required. Smith v. District of Columbia, 466 F. Supp. 2d at 157; see id.
> at 161.

Petties v. District of Columbia, Opinion and Order [#1693], Civil Action No. 95–0148 at 12–13

(D.D.C. Oct. 20, 2009). In total, the plaintiff in Role Models sought "$342,741.25 for more than

1,000 hours of legal work performed, as well as $12,733.44 in expenses," and the award was

ultimately reduced by fifty percent. Smith, 466 F. Supp. 2d at 157.

This case is far more akin to Blackman v. District of Columbia, 677 F. Supp. 169,

179-180 (D.D.C. 2010), where the records, "when reviewed by an individual with knowledge of

the case, and in light of the surrounding entries" provide "sufficient information to determine

what work was performed and why it was relevant to the case." Notably, Judge Paul Friedman was satisfied that the plaintiffs' "7% across the board reduction in fees requested" ameliorated any problems potentially caused by deficient records. Id. at 180. Here, too, it is evident from the context of the fees petition that an entry such as "Research and draft brief" is appropriate, and Weismann has "reduced hours assigned to a specific litigation task by 10 percent" to avoid the risk of overbilling. [#24-2] at 5.

Furthermore, former Chief Judge Royce Lamberth held that entries such as "organize deposition documents," "organize case files," and "legal research: Opposition" were sufficiently detailed because they were "part of a larger, detailed summary of the hours worked." Harvey v. Mohammed, 951 F. Supp. 2d 47 (D.D.C. 2013).[21] On the other hand, entries that "merely state that a meeting occurred without specifying the subject-matter or purpose" are not recoverable. Id. The adequacy—or inadequacy—of individual timesheet entries thus turns on whether the court can understand, in context, what is being billed and how it relates to the case.

This Court is persuaded by Judges Kessler, Friedman, and Lamberth that the entries, when viewed in context, provide sufficient information to distinguish this matter from Role Models. Accordingly, CREW has provided sufficient detail for each of its entries and its award need not be discounted.

* * *

The ultimate question raised by all of the FEC's objections is whether CREW has provided sufficient detail and information in its timesheets for the Court to determine "with a high degree of certainty" that its hours were reasonably expended. Role Models, 353 F.3d at 970 (internal citation and quotation omitted). CREW has done so. An outside observer with no

---

[21] The Westlaw version of this opinion does not currently contain page numbers, making a pin cite impossible. However, headnotes thirty and thirty-one correspond with this discussion.

knowledge of this case might look at an entry such as "11/26/12 Research supplemental brief 1.5 [hours]" and find it an inadequate explanation of what occurred. But to one familiar with this case—such as the FEC or this Court—it is clear that entry means that CREW seeks reimbursement for 1.5 hours spent doing research for a supplemental brief required after the D.C. Circuit asked the Department of Justice to brief whether it supported the FEC's position. CREW should not be expected to reasonably provide any greater detail, and it has therefore carried its burden.[22] This Court has reviewed CREW's timesheets and determined that the requested fee is reasonable. CREW is therefore entitled to an award of $139,998.68 in attorney's fees.

## IV.  Conclusion

CREW has carried its burden of showing that it is eligible for a fee award, entitled to a fee award, and has asked for a reasonable fee. For the reasons stated above, this Court recommends that CREW be awarded $139,998.68 in attorney's fees and $500 in costs.[23]

**Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations. See Thomas v. Arn, 474 U.S. 140 (1985).**

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

---

[22] Even if it had not, the FEC's suggestion that CREW's fee award should be discounted by fifty percent is grossly disproportionate. In prior cases, where CREW had plainly inadequate declarations and timesheets, Judge Bates discounted its requested fee by ten percent, and Judge Boasberg discounted its requested fee by thirty-five percent. Given that CREW's declarations and timesheets are far better in this case, there is no basis for the government to suggest an even worse penalty.

[23] The FEC did not contest CREW's claim to $500 in costs, which is therefore conceded.